IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

ELEAZAR CONTRERAS-RAMOS, and
JOSE ANGEL CONTRERAS-OLMOS,

   Defendants.

Crim. No. 06-60117-AA
OPINION AND ORDER

---

Karin Immergut
United States Attorney
District of Oregon
Kirk Engdall
Assistant United States Attorney
405 E. Eighth Avenue, Suite 2400
Eugene, Oregon 97401
 Attorneys for plaintiff

Kelly Beckley
Beckley Law Firm, P.C.
1257 High Street, Suite 2
P.O. Box 11098
Eugene, Oregon 97440
 Attorney for defendant Eleazar Contreras-Ramos

///

Page 1 - OPINION AND ORDER

William Sharp
Monks & Sharp Law Office
1342 High Street, 2nd Floor
Eugene, Oregon 97401
    Attorney for defendant Jose Angel Contreras-Olmos

AIKEN, Judge:

Defendants Eleazar Contreras-Ramos (Ramos) and Jose Angel Contreras-Olmos (Olmos) filed motions to suppress "any and all evidence" obtained from several searches and seizures. The court held oral argument on this matter on September 27, 2007. After considering the testimony of witnesses, the admitted exhibits and the arguments of counsel, defendants' motions to suppress are denied.

## CHARGES

Defendants are charged in a three-count indictment as follows: Count 1 - Distribution of a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; Count 2 - possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2; and Count 3 - possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2.

## BACKGROUND

On September 28, 2006, Detective Scott Vinje (Vinje) of the Eugene, Oregon Police Department was conducting a narcotics

investigation, assisted by Detective Keith Seanor (Seanor) of the Springfield, Oregon Police Department. On this date, Vinje made a controlled buy of methamphetamine, using a confidential reliable informant (CRI). The controlled buy was made directly from defendant Ramos, whom Seanor also knew as "Hector." Vinje arranged the buy based on information obtained from a CRI that Ramos was selling large quantities of methamphetamine in the Eugene-Springfield area.

At the time of the controlled buy, Ramos was the passenger in a red 1997 Honda Civic, Oregon license plate number ZJK352. A second individual, later identified as defendant Olmos, drove the Honda when the controlled buy occurred.

After the controlled buy occurred, police officers followed the Honda. The Honda made a brief stop at 4887 Daisy Street, a residence in Springfield, Oregon; and another brief stop at the Gateway Motel 6, 3752 International Court, Springfield, Oregon. Vinje testified that such short duration stops, coupled with the controlled buy that had just occurred, are indicators of further drug distribution.

After the Honda left the Motel 6 with defendant Ramos in the passenger seat and defendant Olmos driving, Vinje decided to stop the Honda. The approximate amount of time elapsed between the controlled buy and the Honda stop was 45 minutes.

The Honda was stopped on Highway 126 between Pioneer Parkway

and Mohawk Boulevard in Springfield by uniformed Springfield police officers. Officer Spencer obtained photo identification from the driver, Olmos, and the passenger, Ramos. Seanor asked Ramos to step out of the Honda, while also motioning with his hands to step out. Ramos opened the passenger side door and quickly placed one hand deeply into his baggy pants pocket, while simultaneously twisting at the waist, so the hand in the pocket was out of Seanor's sight. Seanor testified that Ramos' action alarmed him and so fearing for officer safety, he drew his weapon and placed Ramos against the passenger door, while telling Ramos to slowly show his hands. Ramos was then handcuffed. Seanor testified that he then briefly patted Ramos' waistband and back pockets to check for weapons.

Officer Seanor testified that he then turned Ramos over to Officer Webber. Officer Webber testified that he asked Ramos if he could speak English and Ramos indicated he could understand what Webber was asking. Ramos the told Webber that he was hurt, but declined to say where and declined medical attention. Ramos subsequently said he was not hurt and asked why he was stopped. Officer Webber testified that he told Ramos he was stopped as part of a methamphetamine investigation. Officer Webber then asked Ramos was asked for permission to pat down his person. Webber testified that Ramos consented saying, "Yes, you can. I don't have guns."

During the pat down, Officer Webber testified that he discovered a cell phone and keys in Ramos' pocket. Webber also felt a ball shaped object in Ramos' right front pants pocket. Webber testified that it felt like it weighed about one ounce and had the crunchy consistency of crystal methamphetamine. When Webber touched the item, Ramos said, "Drogas . . . it's just for me." Webber testified that Ramos consented to the removal of the suspected methamphetamine.

Ramos was then read his Miranda rights from a Spanish Advisal of Rights card. The defendant read it along with Webber and said he understood. Ramos said he possessed a little more than an ounce of methamphetamine, but denied he was a drug dealer. Officer Webber testified that Ramos then gave him consent to look through his wallet. Webber found a key to a room at the Gateway Motel 6. When specifically asked by Webber if there were drugs in the motel room, Ramos said no.

Ramos subsequently admitted buying the ounce of methamphetamine on that day, saying he purchased it about two hours prior to the stop of the Honda. He stated that the methamphetamine was purchased from a man on Mill Street in Springfield for $800.

Olmos was similarly advised of his Miranda rights from a Spanish Advisal of Rights card. Olmos read the card along with Webber and acknowledged that he understood his rights.

Both Ramos and Olmos consented to a search of the car. Inside, the police found another ounce of methamphetamine near the driver's seat.

Melanie Nichole, a Springfield Police Department 911 dispatch operator who is fluent in Spanish, testified that she assisted the officers' interview with Olmos. The officers testified that both defendants signed a "Consent to Search" form and agreed to have their room at Motel 6 searched. Ramos also orally and in writing consented to the search of his residence at 4887 Daisy Street, Springfield, Oregon.

Detective Jeff Drullinger with the Eugene Police Department, Detective George Crolly with the Springfield Police Department, and Detective Seanor conducted the search of Room 255 at the Gateway Motel 6. In the room the officers saw a large, black, canvas-style duffel bag which had a zippered top for the main compartment. The top zippered compartment was locked with a very small padlock. Drullinger testified that he was able to open the lock and found tucked between the clothing $4,300 in U.S. currency, a digital scale, a baggie of plastic sacks, envelopes and approximately 1,496.8 grams (approximately 3 pounds) of suspected methamphetamine.

After being advised of his Miranda rights, Ramos admitted to the officers that he had rented Room 255 at the Gateway Motel 6 for Olmos as Olmos did not have identification and could not rent

a room without identification. Detective Webber testified that Olmos claimed ownership of the black duffel bag and identified many of the items in the bag, including paperwork for the Honda he was stopped in while driving. Detective Webber, however, testified that Olmos insisted he was not aware there was methamphetamine in the duffel bag.

Webber, Seanor and Drullinger went to Ramos' residence at 4886 Daisy Street, after Ramos had provided both oral and written consent to search. While at the residence, the officers testified they were given consent to search anywhere they wanted by Ramos' wife, Nickey Lavon Contreras. Despite conflicting testimony by Ms. Contreras, I find the officers' testimony credible on this issue.

While searching the upstairs bedroom shared by Ramos and Nickey Contreras, Webber found $310 plus $80 in a dresser drawer. The money was on top of Ramos' social security card and permanent resident alien card. Further, Webber determined that the serial numbers on the $80 matched the buy money used for the controlled buy set up by Vinje, approximately 45 minutes prior to both defendants being stopped in the Honda on September 28, 2006.

## DISCUSSION

Defendants move to suppress all evidence obtained from the following searches and seizures occurring on September 28, 2006: 1. the stop of the Honda driven by Olmos, and within which Ramos

was the sole passenger;

2. the search of Room 255 at the Gateway Motel 6;

3. the search of a locked duffel bag and the closed containers within;

4. the search of Ramos' residence; and

5. the search of a closed dresser drawer located in a bedroom in Ramos' residence.

Defendants argue that such searches and seizures violate the Fourth, Fifth and Fourteenth Amendments. Specifically, defendants assert that no probable cause existed for the police to stop the Honda, and without probable cause the alleged consent the police officers obtained to search the motel room and residence was tainted and therefore invalid. Moreover, defendants assert that the search of the locked duffel bag and the contents within, as well as the search of Ramos' dresser drawer violated the Fourth Amendment in that those searches were performed without a warrant and exceeded the scope of any consent given by either defendant.

When police officers stop and search a motor vehicle without a search warrant, the government bears the burden of proving the search was lawful. <u>United States v. Johnson</u>, 936 F.2d 1082, 1084 (9th Cir. 1991). Traffic stops are considered seizures under the Fourth Amendment; law enforcement officers must have at least a reasonable suspicion of criminal conduct before detaining a

driver. United States v. Rojas-Millan, 234 F.3d 464, 468 (9th Cir. 2000). Reasonable suspicion "is formed by specific, articulable facts which, together with objective and reasonable inference, form the basis for suspecting that the particular person detained is engaged in criminal activity." Id. at 469.

The government argues that it had probable cause to stop the vehicle. I agree. Probable cause sufficient to justify a search exists where, in the totality of circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238 (1983). Moreover, a seizure may be justified under the Fourth Amendment based on "the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop." United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005).

Here, considering the totality of circumstances, there was a fair probability that contraband or evidence of a crime would be found, and therefore sufficient probable cause existed to stop the Honda. Vinje's testimony detailed the probable cause that existed. That probable cause derived primarily from information gathered by Springfield police officers and the controlled buy which occurred on September 28, 2006. Vinje supervised the

controlled buy. The defendants were then under continuous surveillance as they made several brief stops (behavior consistent with drug trafficking) which provided further probable cause to stop the Honda. The court notes that the approximate time elapsed from controlled buy to arrest was 45 minutes.

Because I find sufficient probable cause supporting the stop, I find no taint attached to the search of the Honda, the search of Room 255 of the Gateway Motel 6, or the search of the Daisy Street residence. See Wong Sun v. United States, 371 U.S. 471 (1963).

Here, I find no illegal stop, and therefore no "taint." As noted above, the stop of defendants' Honda was based on probable cause, therefore there is no "taint" and no grounds to suppress the evidence seized from those searches.

Defendants also assert that search of the duffel bag in the motel room exceeded the scope of consent provided by defendants to search the motel room. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would a typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991)(internal citations omitted). The question for this court to consider is: when general consent was given by both defendants to search Room 255, with no reservations or limitations upon

their consent, does that consent cover the search of the black duffel bag, secured by a very small padlock? The answer must be yes. Testimony established that the room was essentially empty except for the black zippered duffel bag, two pieces of paper, some cell phone chargers and a few items of clothing. Both defendants granted permission to Vinje to search Room 255. The defendants did not place any explicit limitation on the scope of the search. Both defendants were present for the controlled buy, Ramos handled the drug deal and Olmos drove the car. Ramos was arrested with methamphetamine on his person. There was additional methamphetamine in the car driven by Olmos. Ramos stated he was not a drug dealer. The officers were obviously looking for additional narcotics in Room 255. I find that it was objectively reasonable for the police to conclude that the general consent to search defendants' motel room included consent to search containers within the room that might reasonably contain drugs. Florida v. Jimeno, 500 U.S. at 251. "A reasonable person may be expected to know that narcotics are generally carried in some form of a container." Id. The search of the black duffel bag found within the motel room was within the bounds of consent to search the motel room. I find no violation of defendants' Fourth Amendment rights by this search.

Finally, I find no violation of defendant Ramos' Fourth Amendment rights by the opening of a dresser drawer, pursuant to

a general consent to search Ramos' residence. Based on credible officer witness testimony, the court finds that Nickey Contreras, Ramos' wife, who was at home during the search also gave consent to search the residence, stating that the officers could search anywhere they wanted. Thus, the consent to search by both parties was unrestricted. Following an objective standard of reasonableness, the Fourth Amendment allows the search of a closed dresser drawer where unrestricted consent has been given to search a house. Id. Further, it is objectively reasonable to search containers, i.e., drawers within the residence, pursuant to consent, where narcotics could be found.

## CONCLUSION

Defendants' motions to suppress (docs. 29 and 34) are denied.

IT IS SO ORDERED.

Dated this 10th day of October 2007.

_____
Ann Aiken
United States District Judge